Good morning, Your Honors. May it please the Court, my name is Peter Morris, and I represent LifeWatch Inc. I'd like to reserve three minutes for rebuttal. I'd like to start with irreparable harm, because I think that's the weakest part of the lower court's rule. LifeAlert has not come close to establishing the necessary irreparable harm in order to issue a preliminary injunction. There must be actual evidence of irreparable harm. But let's look at what evidence there is. The only evidence of irreparable harm to LifeAlert is past minor harm at best. Two emails from potential customers of LifeAlert where they say, I'm not going to use LifeAlert because I received robocalls and that made me mad. Now, there's no proof that those robocalls were made on behalf of my client, LifeWatch. In addition to those two emails, there's a declaration from an officer of LifeAlert where the officer says, LifeAlert received numerous complaints of robocalls. That's it. And again, there's no proof that those calls were made on behalf of LifeWatch. That's the only thing in the record that goes at all to harm. Wait a minute. Isn't there something in the record that an employee of LifeAlert received a LifeWatch product? Okay. Well, there are five and only five transcripts of calls in which a telemarketer, including one made to the LifeAlert employee, where the telemarketer used the mark, help, I've fallen and I can't get up. Okay. Now, with respect to those calls, there is no evidence, first of all, that LifeWatch had any knowledge of those statements in those calls. And that's five calls out of literally hundreds of thousands of calls. When you say there's no evidence that LifeWatch had any knowledge of the content of those calls, I think that's wrong. I think there's enough evidence from which one could infer. When you say no evidence, I think that's overstating the case. Okay. Well, let me address that. So let's talk about the inference that LifeWatch did know. It was aware that these calls were saying these things. Correct. Correct. Okay. I was specifically stating there's no evidence that they did know, but let's talk about inferences that they did know. Okay. First, there's no evidence that LifeWatch listened to any recording that had that statement of that mark, first. Second, there's no evidence that LifeWatch prepared, reviewed, approved of a script that had the use of the mark, that a telemarketer would be using. There's no evidence of anybody communicating to LifeWatch and saying, hey, you know, when your products are being sold, your telemarketers, and not their telemarketers, but the telemarketers calling. Yeah. How far are we into discovery in this case? Okay. I'm not the trial lawyer, but I did speak to the trial lawyer yesterday. And what I was told specifically is that even though the trial is, I think, mid this year, it's very little discovery has been done. Okay? I guess my question wasn't precise. How much discovery had been done at the time the record was produced for purposes of the preliminary injunction? Very little. So when you say no evidence, that doesn't mean there's no evidence after we've had a lot of discovery. The question is whether there's sufficient evidence at this stage from which the district judge could reasonably infer things. No doubt. That's exactly what I mean. Okay. Okay. Now, with respect to ongoing harm, because what we just talked about was past harm, all those five recordings that Your Honor was referring to, and then the two e-mails that I referred to, and the statement by the officer that they were hearing, they were being told there's a lot of robocalls, that's all past. There's no inference even that there's any ongoing harm. The fact is that there's a purchase agreement in place now with all of the sellers who employ the telemarketers who make the calls. There is a purchase agreement in place now with all of the sellers, between LifeWatch and the sellers, that specifically says, number one, the sellers identify the scripts, and number two, and it says it throughout the purchase agreement, your telemarketers cannot violate any laws, including the laws with respect to using marks. So the overall point here, Your Honors, is, you know, this is a preliminary injunction. It's a serious thing. You're saying you just, to the extent your last characterization of that agreement is correct, you're saying you're complying with the preliminary injunction? Which you should be. You mean my client. Of course. Not you personally. No, no, I didn't mean that. I just meant you didn't mean LifeWatch. But, no, no, but the purchase agreements were prepared and entered into before the preliminary injunction. There's the first one, right? The first one where they were handing them the scripts and reviewing them the scripts. Well, there's the telemarketing agreement, I think it's called telemarketing services agreement, in which it does state that LifeWatch will provide scripts to the telemarketers. Now, there's no evidence, in fact, that LifeWatch did that. But, yes, that's what the telemarketing services agreement states. But why isn't the agreement itself evidence? No, it is evidence. So, again, you're saying there's no evidence when you don't really mean that. Well, wait. No. First of all, that agreement states that LifeWatch will provide scripts to the sellers who use the telemarketers. There's no script in the record that is a LifeWatch script that has in the script say, you know, the line, my company is, the same company says, you know, I've fallen, I can't get up. No script at all. There are two scripts in the record from 2012, I think one in June and one in October 2012, which do include that statement, but they're not LifeWatch scripts. I mean, there's literally no evidence that those are LifeWatch scripts. So, no, I stand by what I said. Now, but then with, but getting back to, so with respect to the purchase agreements, though, so the first of the telemarketing services agreement, which Judge Wardlaw just referred to, then after that, but before the preliminary injunction was entered into, I mean, ordered, the purchase agreements were used. And those purchase agreements, as I said, specifically state that LifeWatch, LifeWatch doesn't have anything to do with the scripts. The seller identifies the scripts to be used by the telemarketers. But let me also say, I'm not, here's the thing. This is not a case where LifeWatch sells a garbage product or a worthless product and, you know, really needs to make false statements to sell the product, because that's, you know, underlying all this is, well, hey, but LifeWatch is benefiting from any statements that telemarketers are making, and in the telemarketing world, and I've prosecuted and represented telemarketers, there's no question that when you have a worthless product, you know, usually you've got to use some false statements to sell the product. This is a terrific product, in fact, the same as the LifeAlert product. So you say this is a terrific product. What evidence do you have in the record that this is a terrific product? Evidence in the record. I mean, there, well, okay. What exactly is the product? Okay, so this is my understanding. There is a console. Here's what gets sold. A console and then some type of either bracelet or necklace that the elderly person wears. If the elderly person falls or, you know, needs to, needs help, they press the button on the either necklace or bracelet. That sends the signal to the console, and then they, through that, the call center or the center notifies police or, you know, whoever else needs to, emergency people who need to come over. That's what it is, which is the same product that's LifeAlert. But with respect to what's in the record, I would put it more this way. There's certainly nothing in the record that LifeWatch's product is a bogus product or worthless product. So there's no need to make false statements. Well, there's a big difference between it being the identical product on the one hand and it being a bogus or worthless product on the other. There's a huge territory between those two descriptions. It could be a product that works but not as well as. No doubt. It could be a product that works more or less the same, but the pricing is worse, the servicing is worse. So I'm asking you if there's anything in the record that tells us whether this is an equivalent product, and you say in the record now there is none. I'm not aware of any statements in the record with respect to that at all. Okay. Okay. Let me go now to trademark infringement, because I also think that the lower court missed the mark with respect to trademark infringement. First of all, there's no evidence at all of LifeWatch controlling anyone using the life alert mark. Okay. What we do know, as Judge Fletcher noted, there are five and only five recordings, scripts of recordings or transcripts of recordings that state the mark, help, I've fallen and I can't get up. And it's been shown that the product sold in connection with those calls was the LifeWatch product. That's how it's connected to LifeWatch. Okay. But there's no evidence that LifeWatch knew that those five out of the hundreds of thousands of telemarketers had made that statement. None. Zero. Does LifeWatch need to know under a vicarious liability theory? Certainly, yes. LifeWatch would need, well, no. For example, if LifeWatch provided, if there was evidence that LifeWatch provided a script to a seller who then provided it to the telemarketer that said, you know, use the mark, I've fallen and I can't get up, then I think it would be reasonable for the court to say, well, look, you provided that to the telemarketer and then they said it. But even if they didn't, if I hire a guy to fix something in my front yard and I don't know how he's going to do it, I say, fix that sprinkler system in my front yard, and he takes an ax to a gas main and blows up the block, he is doing that work within the scope of his employment, even though I have no idea what tools he's going to use. How is that any different than this case? It's hugely different for this reason. You're talking about tort. This is trademark infringement, completely different law. But I'm talking about agency. Yeah, but there's... Isn't agency the same whether it's trademark or... I didn't know there was a specific agency trademark law versus just general agency law. Maybe there is. Maybe I'm wrong about that. Well, I mean, no, there's no law that says that if somebody who is making a call on your behalf, an agent, infringes on the mark, your response, likewise, you're responsible unless you control them or... Control is the standard, I believe, here because this is a services product. This is a services. We're dealing with service as opposed to goods or product. Counsel, you're running out of time. Oh, okay. You actually are out of time. I can give you a minute for rebuttal if you want to... Yeah, I'll just come back on rebuttal. Thank you very much. Thank you. Good morning. Jill Petrini for Plaintiff Life Alert. As I've heard with defense counsel's argument, the appeal is based on the notion that there's no evidence to support a well-reasoned 22-page opinion of the district court. I think that's wrong. There's evidence to support each prong of infringement that was alleged direct, contributory, and vicarious. And there's two levels of direct infringement here. One is the life alert marks and the other is the you're never alone trademarks. The district court, in its opinion, noted certain evidence to support the direct infringement of the life alert, which include the I've fallen trademarks. And that was that customers told the plaintiff that the telemarketers used the I've fallen trademarks. There were transcripts of calls where the telemarketers, where they've used the I've fallen or life alert trademarks, and the declarations of consumers or customers who were told telemarketers were connected with the I've fallen trademarks. That's the three pieces of evidence that the district court relied upon. There was much more in the record, and it's a fairly voluminous record. But some of the things that were also in the record is that LifeWatch fulfilled the contract, and it does both in the purchase agreement and in the worldwide format of the telemarketing agreement. That wasn't the only one, by the way. We had submitted evidence of another telemarketing agreement with Consumer Voice, I believe it was. I was going to say, there was a prior permanent injunction against LifeWatch that LifeAlert had obtained? Correct. In similar litigation? It was based on use of the LifeAlert trademarks on the Internet and in sponsored ads of that nature. It did not include the you're never alone trademark. And the concern was that it didn't specifically cover the robo-calling conduct that was going on here. So it wasn't broad enough to encompass the current alleged conduct? That was the fear. I think it is broad enough if you look at the language of it, but it certainly would not cover the you're never alone, because that was not part of the case and not part of the terms of the injunction that Judge Schneier had on that. Other evidence in terms of direct infringement of the I've fallen trademarks is that the customers would call the customer service number that was given to them on the phone when they were talking to people, and then they would call back and they would say, hello, this is LifeWatch, and that happened a couple times. And that was in SCR 218 to 220, 225 to 227. Another point is that LifeWatch collected the money from the customers directly. It never went. The money didn't flow from the customer to the seller to LifeWatch. It went from the customer to LifeWatch directly. And that was in SCR 36 to 37 and SCR 248 to 252. And as noted with these scripts, LifeWatch dictated the content of the scripts. And what you have on that is you've got the worldwide agreement that specifically says that, and there's a provision in that worldwide agreement, that format, where the telemarketers had to adhere to the format of the script. You've also got the declaration of Kenneth Gross, who's the chairman of Connect America, who had discussions with Evan Serlin, who's the president of LifeWatch, where he is saying, yes, we do the robocalling and we monitor the scripts. You've got the declaration of Mr. Steinmetz, where he worked at LifeWatch for a couple years, and he said they control and dictate the scripts. The other important point to note is that we submitted evidence of two telemarketing applications filed with the state of Florida by LifeWatch, and that is on SCR 94 to 109. And what the applications state is that LifeWatch is attaching copies. And this is where we got some of the evidence is from that. And this is in answer to question 11 on the telemarketing applications. The first one submitted was November 9, 2012. The second one, the renewal, was December 10, 2013. Question 11 was they checked the box to attach your copies of all sales scripts given to those soliciting for us. And then question 12, which is, again, same questions in both applications, both years, attach your copies of all sales information or literature provided to our salespeople. And that's where we got the call center, the welcome call center package, and that you will find on SCR 82 to 92. And in that call center package, it gives samples of scripts, and then it also states that the scripts must be approved by LifeWatch. The other point in terms of direct infringement is that LifeWatch provides product descriptions, pricing, and phone information to sellers. That was in the deposition of Mr. Duran, SCR 42 to 45. What is in the record about the nature of the products? Are they substantially similar products? Oh, yeah, they are. And defense counsel is right. What it is, it's older people. They have a device in their house, and it has a speaker, and there's a picture of it attached to Mr. Gates's declarations at the end of the SCR. That was the gentleman that you referred to, Justice Fletcher. And then they have a pendant or a bracelet, and if they fall or something happens, they can press it, and then the fire department or ambulance comes depending on what the situation is. But they're direct competitors on this. And the other interesting thing about the direct infringement, and some of this bleeds into the control issue or the contributory infringement issue, is that when the people buy the product, they're on the phone with the telemarketer. They think that it's life alert if they're using the iPhone, or they say you're never alone. They do that sometimes in the scripts. When they get the product, it comes with a ‑‑ when Connect America was involved, it came with a form letter that said, welcome to the LifeWatch family. And that was attached as ‑‑ that is attached to the first amended complaint. They also, the products themselves that are received, the device, the device that activates the bracelet or the necklace said LifeWatch on it. And then another point on direct infringement is that the sellers have login IDs on the CRM system, which is a customer relationship management, and they have full access to the database of LifeWatch. And that exists as of today. Nothing has changed on any of that. So you've got significant evidence of direct infringement, of the life alert and the iPhone trademarks. You've also got direct infringement on the you're never alone, and that was indicated in ER 167 to 255. Their LifeWatch was using you're never alone with LifeWatch on their website. We submitted evidence of that. And it's also, like I said, in the scripts, and that is on ER 275 to 293. Now, going on to the evidence of contributory infringement, in addition to what Judge Cronstadt submitted and identified in his opinion, there's lots of other evidence that there was intentional inducement to the sellers to infringe or that they continued to supply goods knowing that there was infringement. And let me just digress for one second on this point. This is a service and not a trademark. Then why do we have product descriptions? And that's what their own witnesses are describing their products as, as products, that you get a tangible product and then that operates through the telephone system to have emergency in case something happens. So the standard of direct control does not kick in if they're making that argument, which I think they are. It doesn't kick in. And remember, there's two prongs on contributory. It's either the intentional inducement or the continuing to supply goods knowing that they're infringing. We allege both, and we submitted evidence of both, and that's what the district court found. Other points in terms to show that there was certainly knowledge and awareness of what the sellers were doing is that under the contract, and this is the new contract, the purchase agreement, it's paragraph 4.1 ER-74, sellers must give all complaints from consumers, Better Business Bureau of Government or law enforcement agencies to LifeWatch. So they were able to get those or they had an obligation, the sellers, to give those to LifeWatch. And then the sellers also retained all scripts, text messages, brochures, advertising, telemarketing, promotional material. That's page ER-74 as well, and it's paragraph 4.3A. There's various versions of the purchase agreement in the record, but it's effectively the same thing. They change the name in it, but it's effectively the same contract. And one thing that's really important, and this was not really highlighted for the district court, but it's certainly in the record, is in paragraph 6.4 of that same contract, the seller is required to adopt and comply with all the compliance policies. Somebody mentioned it in terms of they comply with the law. There's about three or four pages of it in that agreement. It's paragraph 6. The whole thing goes through. And notably, LifeWatch has the right to inspect and verify compliance. So that's a significant point here. LifeWatch provides the product descriptions, phone information, and pricing information to the sellers, and that's SER-42 to 45. I've already mentioned the call center welcome package, and I've already mentioned the telemarketing applications. We've also submitted evidence in addition to the declaration of Mr. Gross, the declaration of Colleen Small, who is the data entry manager of Connect America, and she dealt directly with Gerardo Duran, who works at LifeWatch, in implementing their contract, and her understanding was that they had complete control over the telemarketers that they were hiring. And keep in mind that the evidence of record is that it was LifeWatch to the sellers. If you want to call them telemarketers, sellers, whatever, they changed the terms. There's no evidence that the sellers then hired a third-party company in order to then implement these telemarketing services. In fact, on the record at the preliminary injunction hearing, defense counsel Joseph Lopari stated in response to the district court that there were two ways, two types of calls to solicit products. Either the consumer calls LifeWatch as a result of seeing an ad on television to ask about the products, or the seller will make a telemarketing call, and that's at SER 195. That's the transcript of the March 10, 2014, hearing on that. So there's this notion that somehow there's another set of people, another company doing the telemarketing. There's no evidence in the record of that at all. In fact, the contracts, and this is in both contracts, the worldwide version and then the purchase order, is that it requires the telemarketer to maintain, the seller to maintain the identity, the contact information for all employees who do the telemarketing. So it suggests that the telemarketing is really the seller. There's no extra step in that front. Counsel, I take it your position would be, let's assume there were no contracts in this case, and simply LifeWatch saw people at a train station and said, you guys want to make some money today, call up people to push our product, and these people say okay, and they're hired to do it, they're paid $20 to do it, and they get a dollar for each successful call. And in those calls, they say things like, oh yeah, we're like the ones on TV, help, and I fall and I can't get up. Well, under a vicarious liability theory, as long as that's within the scope of their employment, would you need to have contracts explaining exactly who got the script and who didn't get the script? No, no, and you're exactly right, because you asked that question to defense counsel. There's no special set of agency law for trademarks. In fact, trademark's a tort. So the law of agency works the way it does, and anyone who is hiring people, whether it's in your scenario, the individual at the train station, or they're hiring an outside seller as their client, they're acting within the scope and course of what they've been offered to do, and they are liable for the actions of their agent. And that's why this case got a little askew, that somehow this is not a direct infringement case. It clearly is. You have the added benefit that we also fall under contributory and vicarious liability. If we were, if I were a one-judge panel, and I were going to affirm in this case, if I affirmed simply on vicarious liability grounds and did not reach direct or contributory, how would that affect, would that, what would the end result be? Would it just be, would it be, would it be altering the district court's order in some way, or would that be sufficient? No, the order would stay in place, because the judge made it clear, it's like he went through each of the prongs in vicarious. Any one of those bases can support the affirmance of the injunction. I've got about 30 seconds left, and just to touch briefly on the irreparable harm argument that was made. The supplemental declaration of the life alert employee, I can never pronounce her last name, so I just call her Olga. She stated that this continues. People are calling, and they think that these robocalls are coming from life alert, and we've already got the admission from Mr. Serlin to Mr. Gross that they engage in the robocalling. You've got the comments from the customers are saying, hey, look, when we call customer service, it's answered life watch, or in some cases, they're saying it in the first instance, in the telephone call, that they are life watch. That was in the Barry Gates declaration, and then another customer, I think it was Holly Florence, on that. So there definitely is evidence of irreparable harm. In fact, this is a case, certainly, given who are being scammed here, there's no question we've got harm to the customers and to the public with this. They're getting calls in the middle of the night. Anyway. Ginsburg. Thank you, counsel. You're over your time. I said I'd give you about a minute. Verrilli, I want to do two things. I want to address Judge Owen's point about agency. So here's the thing. In your example of going to a train station or whatever you said and saying, hey, will you make calls for us and say these things? No question. Well, not say these things, just make calls for us and not specify what would be said. Just push our product. Can you guys push our product? Great. I'll give you $20, and for every successful hookup, you get a buck. You guys decide what to say. Okay. No. Then my client would not be responsible, because you have to either have direct control over what the people are doing. If they say something that is false, they're rogue, and that's what they are here. They're rogue telemarketers. And rogue telemarketers, just the same as in the criminal context, rogue telemarketers, you're not responsible for their conduct. Do you have any case that says in an agency conduct that if someone is operating within the scope of employment but doesn't do exactly what the employer thought they were doing, that therefore there's no liability? I don't. I don't have a case. Okay. So your situation is completely different than the situation here, which is LifeWatch contracts with a party called a seller, and that seller contracts with the telemarketers. That's exactly what the purchase agreement says, 100%. In that case, the telemarketers who are making the statements are not agents. The last thing I want to say, I can do it probably in 30 seconds. Do it. Okay. Even if the court disagrees with reversing and throwing out the preliminary injunction, there's a key point, and that is that the injunction is fatally flawed for this reason. The court put in the injunction, or after a reasonable inquiry should know. So you know that the telemarketers are making the false statements and you're getting the clients. Okay. That's fine. Saying that phrase should be excised? Yes. Why? Because it's impossibly vague. For example, is LifeWatch supposed to listen to every call of the hundreds of thousands of calls? Are they supposed to listen to some percentage of them to make a reasonable inquiry? There's absolutely no guidance about what LifeWatch is supposed to do. Yeah, but if the argument is that there's no guidance from the word reasonable, how much of American law goes down the toilet? Yeah, but this is not law. This is an injunction, and the law specifically says you have to state its terms specifically. Well, wouldn't the correct remedy be if you thought you were borderline to go back to the district court? Well, I think that based on the law, you can just strike that language. All right, counsel. You've covered it. And we will submit life alert emergency response versus LifeWatch, and this session of the court is adjourned for today. Thank you very much. Thank you, counsel. Thank you.
judges: Wardlaw, Fletcher, Owens